# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-60760-CIV-ALTMAN

**JOSEPH PIERRE**,

     *Petitioner,*

*v.*

**RICKY D. DIXON, SECRETARY,**
**FLORIDA DEPARTMENT**
**OF CORRECTIONS**,

     *Respondent.*

_____/

## <u>ORDER</u>

Joseph Pierre was convicted in state court of attempting to murder his ex-wife. He's now filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging the constitutionality of his state-court conviction and sentence. *See* Petition [ECF No. 1]. After careful review, we **DENY** the Petition.

## THE FACTS

The State of Florida charged Pierre by Information with one count of first-degree attempted murder (with a firearm). *See* Information [ECF No. 9-1] at 8. After a state-court jury found Pierre guilty, *see* Verdict [ECF No. 9-1] at 10–11, the trial judge sentenced him (on November 4, 2016) to life in prison, *see* Judgment and Sentence Order [ECF No. 9-1] at 18–22.

Pierre appealed his conviction and sentence to Florida's Fourth DCA. *See* Direct Appeal Notice of Appeal [ECF No. 9-1] at 27. In that appeal, Pierre—through counsel—pressed two arguments: (1) that the trial court erred when it allowed the State "to introduce into evidence a multi-colored ski mask found in [Pierre's] car that clearly was not the mask used during the shooting"; and (2) that "[t]he trial court reversibly erred by permitting a car mechanic, Brian Sylvia, to testify regarding

matters outside his expertise . . . . Sylvia should not have been permitted to testify regarding the composition of the side mirror—which, intrinsically, was a matter of paint and bodyworks." Direct Appeal Initial Brief [ECF No. 9-1] at 57.

On May 16, 2018, the Fourth DCA affirmed Pierre's conviction in a written opinion. *See Pierre v. State*, 246 So. 3d 545, 548 (Fla. 4th DCA 2018). Because "most of the issues were not properly preserved for review," the Fourth DCA refused to consider many of Pierre's arguments *de novo. Id.* at 546. So, for instance, as to Pierre's first claim—that the trial court erred in admitting the "multi-colored ski mask"—the Fourth DCA held that, while "reasonable minds may differ as to whether the second mask was relevant to the issues of the state's or the defense's case," it would "not reach the merits of whether the probative value of the second mask was substantially outweighed by the danger of unfair prejudice it imposed because Pierre failed to assert this ground below." *Id.* at 547. Likewise, the court "[did] not reach the merits of Pierre's unpreserved argument that [Sylvia] was erroneously allowed to testify to the composition of the side mirror." *Id.* at 548. And, the court concluded, "[n]either the admission of the mask nor the expert testimony—if erroneous—amounts to fundamental error, as the jury could have found Pierre guilty based on the eyewitness testimony of his son and ex-wife alone." *Ibid.*

On December 5, 2018,[1] Pierre filed a *pro se* Motion for Postconviction Relief in state court under FLA. R. CRIM. P. 3.850. *See* Postconviction Motion [ECF No. 9-1] at 149–69. The Postconviction Motion raised five grounds for relief: (1) that trial counsel was ineffective "for failing to move for [a] mistrial and object to the prosecution's failure to turn over a video tape of the entrance of Mayfair which is a gated community where the attempted murder of [the victim] took place and the video tape

---

[1] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

that was withheld was exculpatory to the defense," *id.* at 152; (2) that trial counsel was ineffective "for failing to object to the [trial] court keeping the selected jury after a forty nine (49) day continuance," *id.* at 160; (3) that counsel was ineffective for failing to argue "that the probative value of the admission of the multi colored ski mask would be outweighed by the danger of unfair prejudice," *id.* at 161; (4) that counsel was ineffective "for failing to renew his objection when Mr. Sylvia testified that the broken pieces of a side mirror found at [the victim's] home came from the Defendant's rented Toyota Corolla," *id.* at 163; and (5) that the cumulative effect of counsel's errors "deprived [Pierre] of a fair trial and due process of law," *id.* at 167.

The State opposed Pierre's Postconviction Motion and urged the postconviction court to summarily deny all five of Pierre's claims. *See* Postconviction Response [ECF No. 9-1] at 172–91. The State reasoned that Pierre "failed to prove deficiency, and [that] he experienced prejudice or detriment as a result of his attorney's actions." *Id.* at 191. On May 6, 2019, the state postconviction court "adopt[ed] the reasoning as set forth in the response of the State" and denied the Postconviction Motion. Order Denying Postconviction Motion [ECF No. 9-1] at 193. Pierre appealed this decision to the Fourth DCA, *see* Postconviction Notice of Appeal [ECF No. 9-1] at 196, and argued that the state postconviction court erred by summarily denying claims one, two, three, and four of the Postconviction Motion. *See* Postconviction Initial Brief [ECF No. 9-1] at 229–30. The Fourth DCA affirmed the state postconviction court in an unwritten opinion. *See Pierre v. State*, 288 So. 3d 55, 55 (Fla. 4th DCA 2019).

On November 7, 2019, Pierre filed a motion for rehearing in the Fourth DCA, contending that the court improperly denied claims one and two and, in the alternative, requesting a written opinion so that he could "petition the Florida Supreme Court for review of the legal issues in question on this appeal." Motion for Rehearing [ECF No. 9-1] at 268. On January 13, 2020, the Fourth DCA

denied the motion for rehearing, *see* Order Denying Motion for Rehearing [ECF No. 9-11] at 282, and issued its mandate, *see* Postconviction Mandate [ECF No. 9-1] at 284 (issuing on Feb. 7, 2020).

Proceeding under FLA. R. APP. P. 9.141, Pierre filed a petition for writ of habeas corpus with the Fourth DCA on January 31, 2020, advancing two claims of ineffective assistance of *appellate* counsel. *See* State Habeas Petition Vol. I [ECF No. 9-1] at 286–300; State Habeas Petition Vol. II [ECF No. 9-2] at 1-8. *First*, Pierre blamed his appellate counsel for failing to argue that "the lower court erred in overruling defense counsel's objection and motion for mistrial when the trial judge took the role of the prosecutor and improperly questioned Petitioner while he was testifying in front of the jury." State Habeas Petition Vol. I [ECF No. 9-1] at 290. *Second*, Pierre castigated his appellate counsel for not objecting to the prosecutor's "improper arguments," which "rose to the level of fundamental error." *Id.* at 298. The Fourth DCA summarily denied the petition on March 24, 2020, *see* Order Denying State Habeas Petition [ECF No. 9-2] at 10, and Pierre filed this Petition two weeks later (on April 8, 2020).

While his federal Petition was pending, Pierre returned to the state trial court with a petition for writ of mandamus. *See* Petition for Writ of Mandamus [ECF No. 49-1] at 2–7. In that state-court petition, Pierre requested "copies of the videos of the front gate entrance and exit of the May Fair Gate Community [sic] and video 2 feet next door to the victim's house where the crime occurred on December 22, 2015." *Id.* at 3. According to Pierre, the State Attorney's Office sent him a letter "saying that the security video surveillance [is] exempt" from disclosure under Florida law. *Ibid.* In his mandamus petition, Pierre argued that this letter proved *both* that the exculpatory video footage exists *and* that the State was improperly withholding it. *See ibid.* ("Petitioner did not commit the crime and the videos obtained by the lead detective will show that Petitioner was not the perpetrator.").

In its opposition to this mandamus petition, the State maintained that its custodian of records, Misty Williams-Bernabe, "discovered a new employee had mistakenly checked the security

video/surveillance exemption box . . . without ordering and searching the file for the requested video," then "personally searched [for] the file, but could not locate any video within the box containing the file or within the file itself" before writing "a letter to Defendant Pierre in which she informed him of the mistake[.]" Response to Petition for Writ of Mandamus ("Mandamus Response") [ECF No. 49-1] at 9–14; *see also* Affidavit of Custodian of Records [ECF No. 49-1] at 23–24 (attesting that the initial letter was sent by mistake and denying that the State file included any videos of the shooting). In other words, the State unambiguously denied that it was in possession of any such video. *See* Mandamus Response [ECF No. 49-1] at 13 ("Considering the State corrected its public records response to Defendant's request for records to indicate no such record exists within the State's file, there is no legal reason for Mandamus to issue.").

On October 21, 2021, the state trial court denied Pierre's mandamus petition "for the reasons put forth in the State's Response to the Petition for Writ of Mandamus." Order Denying Petition for Writ of Mandamus [ECF No. 49-1] at 57. Pierre appealed this denial of his mandamus petition to the Fourth DCA, *see* Mandamus Notice of Appeal [ECF No. 49-1] at 59, insisting again that the State possessed this exculpatory video, despite Ms. Williams's affidavit to the contrary, *see* Mandamus Initial Brief [ECF No. 49-1] at 71 ("The affidavit of the custodian of records is insufficient to establish that the State does not have the exculpatory video evidence because there is overwhelming evidence . . . that the video exists and the State has the exculpatory evidence."). The Fourth DCA affirmed the trial court's denial of Pierre's mandamus petition in an unwritten opinion on June 9, 2022. *See Pierre v. State*, 2022 WL 2070449, at *1 (Fla. 4th DCA June 9, 2022).

## THE LAW

### I.     The Antiterrorism and Effective Death Penalty Act ("AEDPA")

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is

required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (cleaned up).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* harmless-error standard requires habeas petitioners to prove that they suffered "actual prejudice." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht*'s actual-prejudice requirement. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or

not' AEDPA applies." (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 1524 (emphasis in original); *see also Mansfield*, 679 F.3d at 1307 ("[A] habeas petition cannot be successful unless it satisfies both [AEDPA] and *Brecht*.").

## II.     AEDPA's Procedural Requirements

"[A] person in custody pursuant to the judgment of a State court" has one year to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). But this limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining that the State may express its intent to "waive the limitations bar").

Beyond meeting this one-year window, though, federal habeas petitioners must also *exhaust* their claims by "*properly* present[ing] [them] to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (emphasis in original). Specifically, federal habeas petitioners must "fairly present every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral

review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fail[ed] to 'properly' present his claim to the state court—by exhausting his claim[ ] and complying with the applicable state procedure—prior to bringing his federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Id.* In other words, where a petitioner has not "*properly* presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan*, 526 U.S. at 848.

All that said, "[s]tates can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (cleaned up)). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

### III.    Ineffective Assistance of Counsel

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). This same standard applies to alleged errors made by both trial counsel and appellate counsel. *See Farina v. Sec'y, Fla. Dep't of Corr.*, 536 F. App'x 966, 979 (11th Cir. 2013) ("A claim of ineffective assistance of appellate counsel is evaluated under the same standard as for trial counsel.").

To establish the first prong (deficiency), "a petitioner must [show] that *no* competent counsel would have taken the action that his counsel did take[.]" *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added). So, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel could not have performed deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong (prejudice), "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To succeed on this prong, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

## ANALYSIS

Pierre advances six claims of ineffective assistance. *See generally* Petition at 3–8. In Ground One, Pierre argues that his trial counsel "was ineffective for failing to object and move for a mistrial . . . where the prosecutor failed to turn over exculpatory evidence in the form of a video tape[.]" *Id.* at 3–4. Pierre castigates trial counsel in Ground Two for "failing to object to the Court's forty-nine [day] continuance after the jury was selected." *Id.* at 4. In Ground Three, he complains that appellate counsel didn't "argue on direct appeal that the lower court erred in overruling defense counsel's objection . . . concerning the lower court improperly questioning Petitioner." *Id.* at 5. Pierre claims in Ground Four that appellate counsel erred in "failing to argue on direct appeal [that] the prosecutor's arguments and misconduct rose to the level of fundamental error." *Id.* at 6. Ground Five contends that trial counsel was ineffective for failing to argue "that the probative value of the admission of a multi colored ski

mask was outweighed by the danger of unfair prejudice[.]" *Id.* at 7. And, in Ground Six, Pierre says that his trial counsel performed ineffectively when he failed "to renew his objection to the [trial court] permitting [Mr. Sylvia] to testify outside his area of expertise[.]" *Id.* at 8.

The Respondent contests all six claims on the merits. *See generally* Response to Petition for Writ of Habeas Corpus ("Response") [ECF No. 8] at 10–26. At the same time, the Respondent insists that we don't need to go that far because (in the Respondent's view) Pierre's claims are unexhausted and should be dismissed. *See id.* at 6 ("Here, all of Petitioner's claims are either procedurally barred or unexhausted.").[2] On this last point, we disagree with the Respondent. So, we reach the merits of Pierre's claims and, applying the "difficult" standard of review set out in § 2254(d), we deny all six.

## I.      Exhaustion

Before reviewing a habeas claim on its merits, we must satisfy ourselves that "the applicant has exhausted the remedies available in the courts of the State[.]" 28 U.S.C. § 2254(b)(1)(A). The Eleventh Circuit has clarified that exhaustion "has two essential requirements": (1) "a federal claim must be fairly presented to the state courts"; and (2) the petitioner "must take his claim to the state's highest court, either on direct appeal or collateral review." *Johnson v. Florida*, 32 F.4th 1092, 1096 (11th Cir. 2022) (cleaned up). The Respondent focuses on the first of these elements—whether Pierre's claims are "federal claims" that have been "fairly presented" to the state courts. In a nutshell, the Respondent believes that Pierre hasn't "raised a federal issue, or relied on federal law, and as such his claims are unexhausted for federal review." Response at 6. In saying so, the Respondent concedes that all of Pierre's claims are "couched in terms of ineffective assistance of counsel"—and that they thus implicate the Sixth Amendment to the U.S. Constitution. *Id.* at 7. Still, the Respondent maintains that

---

[2] The Respondent concedes that "the instant petition is timely filed pursuant to 28 U.S.C. § 2244(d)." Response at 4. We'll accept that waiver and treat the Petition as timely. *See Day v. McDonough*, 547 U.S. 198, 209–10 (2006) ("[A] district court is not required to doublecheck the State's math [for timeliness purposes].").

Pierre's invocation of *Strickland* and the Sixth Amendment is really a red herring and that all of his claims "are related to matters of state law exclusively[.]" *Ibid.* In other words, according to the Respondent, "[n]one of the claims presented have expressly pointed out any federal implication." *Ibid.*

The thrust of the Respondent's argument, then, is that Pierre's characterization of his Petition as arising from an "ineffective assistance of counsel" is just a "Trojan horse" he's cleverly constructed as a way of circumventing § 2254's prohibition against our review of state-law claims. *Cf. McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992) ("A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."). Unfortunately for the Respondent, the Eleventh Circuit has been clear that "the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension[.]" *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984). In other words, even when a habeas petitioner alleges that counsel was ineffective in his handling of a *state-law issue*, a federal court may review the state court's application of the *Strickland* test. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("As a result, when § 2254(d) applies, as it does here, 'the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" (quoting *Richter*, 562 U.S. at 105)). What we may not do, however, is second-guess the state court's resolution of *state law. See Will v. Sec'y for Dep't of Corr.*, 278 F. App'x 902, 908 (11th Cir. 2008) ("Although an ineffective-assistance-of-counsel claim is a *federal* constitutional claim, which we consider in light of the clearly established rules of *Strickland*, when the validity of the claim that counsel failed to assert is clearly a question of *state* law, we must defer to the state's conclusion of its own law." (emphasis in original & cleaned up)).

To recap, while we retain the power to review the state court's application of *Strickland* to the facts of Pierre's case, we cannot question its application of state law. *See, e.g., McGhee v. Sec'y, Dep't of Corr.*, 2019 WL 3388232, at *5 (M.D. Fla. July 26, 2019) (Hernandez Covington, J.) (rejecting an

ineffective-assistance claim "for not arguing that the trial court erred when it denied a mistrial" since the state courts concluded that "the basis proposed by McGhee would not have succeeded under Florida's mistrial standard"); *Midgett v. Sec'y, Dep't of Corr.*, 2018 WL 3769864, at *11 (M.D. Fla. Aug. 9, 2018) (Hernandez Covington, J.) ("Midgett has not established an error in the jury instructions to which counsel should have objected. To the extent the state court's determination that the manslaughter instruction was proper involves an application of state law, it must be afforded deference.").

As we've explained, the Petition raises four claims of ineffective assistance of *trial* counsel and two claims of ineffective assistance of *appellate* counsel—all of which Pierre has exhausted. To exhaust an ineffective-assistance-of-*trial*-counsel claim, the petitioner must raise the claim in a state postconviction motion under FLA. R. CRIM. P. 3.850. *See Sullivan v. Sec'y, Fla. Dep't of Corr.*, 837 F.3d 1195, 1199 (11th Cir. 2016) ("Florida requires that ineffective assistance of counsel claims generally be raised on collateral review pursuant to [Rule 3.850].". And that's not all: "[E]xhaustion usually requires not only the filing of a FLA. R. CRIM. P. 3.850 motion, but [also] an appeal from its denial." *Nieves v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 520, 521 (11th Cir. 2019) (quoting *Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979)). Pierre has done precisely that. *See* Postconviction Motion [ECF No. 9-1] at 149–69 (arguing the substance of Grounds One, Two, Five, and Six); Postconviction Initial Brief [ECF No. 9-1] at 203–56 (appealing the denial of those four *trial*-counsel claims).

By contrast, Florida law requires that an ineffective-assistance-of-*appellate*-counsel claim "be raised by petition for writ of habeas corpus in the appellate court which considered the appeal." *Simpson v. State*, 617 So. 2d 749, 749 (Fla. 1st DCA 1993); *see also* FLA. R. APP. P. 9.141(d)(3) ("Petitions alleging ineffective assistance of appellate counsel shall be filed in the court to which the appeal was taken."). If the district court of appeal summarily denies the ineffective-assistance-of-appellate-counsel

claim, then that claim has been fully exhausted for purposes of § 2254, because the habeas petitioner is then precluded from seeking further review in the Florida Supreme Court. *Cf. Tolbert v. Florida*, 796 F. App'x 704, 705 n.1 (11th Cir. 2020) ("Because the Fourth District Court of Appeal made its decision in a per curiam, unwritten affirmance, the Florida Supreme Court lacked discretionary review jurisdiction." (citing *Wells v. State*, 132 So. 3d 1110, 1113 (Fla. 2014))). And that's exactly what happened to Pierre's two appellate-counsel claims. *See* Order Denying State Habeas Petition [ECF No. 9-2] at 10 ("ORDERED that the petition alleging ineffective assistance of counsel is denied.").

Since Pierre has thus exhausted all six of his claims, we'll consider the merits of each claim in turn.

## II.     The Merits

As we've said, we must apply § 2254(d)'s heightened standard of review to any claim "that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). And all four of Pierre's trial-counsel claims (Grounds One, Two, Five, and Six) plainly fall into this category. It's true, of course, that the Fourth DCA only affirmed the trial court's denial of these claims in an unwritten opinion. *See Pierre v. State*, 288 So. 3d 55, 55 (Fla. 4th DCA 2019). Still, the Supreme Court has instructed us to "look through the unexplained decision to the last related state-court decision that does provide a relevant rationale[.]" *Wilson*, 138 S. Ct. at 1192. And, because the state postconviction court simply "adopt[ed] the reasoning as set forth in the response of the State," we presume that the Fourth DCA applied the reasoning in the State's Postconviction Response when it denied Pierre's trial-counsel claims. Order Denying Postconviction Motion [ECF No. 9-1] at 193; *see also, e.g.*, *Cardona v. Dixon*, 2022 WL 2158715, at *6 (S.D. Fla. June 14, 2022) (Altman, J.) ("[T]he state postconviction court adopted the State's Postconviction Response as [its] findings of facts and conclusions of law. We thus presume that both the state postconviction court and the Fourth DCA adopted the arguments the State pressed in those responses." (cleaned up)).

We'll also apply § 2254(d)'s standard of review to the appellate-counsel claims (Grounds Three and Four), albeit for a different reason. Unlike the trial-counsel claims, the only court that adjudicated Grounds Three and Four was the Fourth DCA—which summarily denied both in a one-sentence order. *See* Order Denying State Habeas Petition [ECF No. 9-2] at 10 ("ORDERED that the petition alleging ineffective assistance of counsel is denied."). This time, we can't "look through the unexplained decision to the last related state-court decision that does provide a relevant rationale," *Wilson*, 138 S. Ct. at 1192, because there is no underlying state-court decision. Fortunately, the Supreme Court has told us what to do when "a state court's decision is unaccompanied by an opinion explaining the reasons relief has been denied": We presume in that scenario "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 98–99.[3] We thus "review the record before the [state court] to determine what arguments or theories supported or, as here, could have supported, the state court's decision." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1232 (11th Cir. 2014) (cleaned up). When we engage in this inquiry, the petitioner bears the "burden [ ] to demonstrate that there was no reasonable basis for the decision of [the state court] to deny his claim." *Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5 F.4th 1278, 1291 (11th Cir. 2021). In sum, we apply § 2254(d)'s heightened standard to the appellate-counsel claims and, in doing

---

[3] Neither party suggests that the Fourth DCA denied Pierre's appellate-counsel claims for some procedural reason. *See generally* Petition; Response; Petitioner's Amended Reply ("Reply") [ECF No. 18]. And, after our *sua sponte* review of the state-court record, we agree that the Fourth DCA (very likely) denied the claims on their merits. Under the Florida Rules of Appellate Procedure, there's really only one procedural hurdle an ineffective-assistance-of-appellate-counsel claim must clear: "A petition alleging ineffective assistance of appellate counsel on direct review shall not be filed more than 2 years after the judgment and sentence become final on direct review[.]" FLA. R. APP. P. 9.141(d)(5). Pierre filed his state habeas petition on January 31, 2020, *see* State Habeas Petition Vol. I [ECF No. 9-1] at 286, which is *less* than two years after Pierre's criminal judgment became final (which happened on June 15, 2018), *see* Direct Appeal Mandate [ECF No. 9-1] at 134 (issuing on June 15, 2018); *see also Baca v. State*, 313 So. 3d 1177, 1180 n.1 (Fla. 1st DCA 2021) ("[T]he judgment and sentence becomes final once the appellate mandate issues."). In short, we agree with the parties that no "state-law procedural principles" prevented the Fourth DCA from adjudicating Pierre's appellate-counsel claims on the merits. *Richter*, 562 U.S. at 99.

so, grant Pierre relief only if he can show that there was no "reasonable basis" for the state court's decision.

### A. Ground One

We begin with what is (to Pierre) the most important issue in the case: the (allegedly) exculpatory video the State (supposedly) suppressed.[4] According to Pierre, the State has refused to turn over two exculpatory videos, in direct violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Postconviction Motion [ECF No. 9-1] at 152 ("At the Defendant's trial it was undisputed that the prosecution did fail to turn over exculpatory evidence in the form of a video tape from the Mayfair gated community's entrance on the date of the crime."). Pierre blames his trial counsel for not objecting to this *Brady* violation as soon as counsel learned of these videos. *See* Petition at 3–4 ("Counsel was ineffective for failing to object and move for mistrial based on a discovery and/or *Brady* violation where the prosecutor failed to turn over exculpatory evidence in the form of a video tape[.]"). The Respondent has a simple counterargument: The videos Pierre is looking for don't exist. *See* Response at 10 ("[T]here was no recording of the crime and therefore no discovery violation that could serve as the basis for a mistrial.").

---

[4] Pierre has been somewhat inconsistent about *the number* of allegedly exculpatory videos he's after. In his Postconviction Motion, he pointed to only one such video: "a video tape of the entrance of the Mayfair gated community[.]" Postconviction Motion [ECF No. 9-1] at 154. Similarly, in his federal Petition, Pierre implies that there's only one video. *See* Petition at 3–4 ("Counsel was ineffective for failing to object and move for mistrial based on a discovery and/or *Brady* violation where the prosecutor failed to turn over exculpatory evidence in the form of *a video tape*[.]" (emphasis added)). In his Reply, though, he refers to a completely different video, one that was supposedly recorded by "a camera two feet next to the Petitioner's ex-wife's house[.]" Reply at 3. And, in his state petition for a writ of mandamus, he referred to *two* videos: the video from the Mayfair entrance *and* the video near the ex-wife's house. *See* Petition for Writ of Mandamus [ECF No. 49-1] at 3 (requesting "copies of the videos of the front gate entrance and exit of the May Fair Gate Community [sic] and video 2 feet next door to the victim's house where the crime occurred on December 22, 2015"). For simplicity's sake, we'll assume that Ground One refers to *both* a video from the Mayfair entrance *and* a video from a camera near the ex-wife's house.

In *Brady*, the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" 373 U.S. at 87. To establish a *Brady* violation, a petitioner must show three things: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1354 (11th Cir. 2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). To prove that counsel was ineffective for failing to object to an alleged *Brady* violation, Pierre would have to show that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Osborne v. Terry*, 466 F.3d 1298, 1308 (11th Cir. 2006).

The state-court record unambiguously resolves this issue because the videos in question *either* don't exist *or*, if they do, the State (it's clear) never possessed them. Pierre's sole basis for supposing that the videos exist comes from Detective Kenneth Johnson, who (according to Pierre) "testified during [his] deposition that there was no video of the entrance of the Mayfair gated community, no relevant videos." Postconviction Motion [ECF No. 9-1] at 153. During the trial, however, Detective Johnson testified "that there *was* videotaped footage of the entrance of the Mayfair gated community." *Ibid.* (emphasis added). Pierre construes Detective Johnson's trial testimony as an admission, not just that the video exists, but that it shows *someone else* entering the Mayfair community. *See id.* at 154 ("Counsel knew a video tape of the entrance of the Mayfair gate community did exist, that the prosecution withheld it based on testimony that it was not relevant to the prosecution and counsel knew the surveillance videos would have identified the shooter and the identification would not have been the Defendant[.]").

Viewed in context, though, Detective Johnson was actually saying that, while he'd reviewed some footage from nearby cameras, none of the videos he'd seen captured anything relevant to the

case. Detective Johnson identified two potentially relevant cameras: the first located "near the gate device that you have to use to get into the complex"; the second connected to a house that was just "two feet away" from the crime scene. Trial Tr. [ECF No. 10-1] at 630. But Detective Johnson was clear that, after watching the footage from both cameras, he decided *not* to retrieve it. Starting with the home camera, Detective Johnson concluded that "[it] did not have any information relevant to the case." *Id.* at 631. And the camera from the entrance likewise didn't capture any footage "that was deemed relevant by the lead detective." *Ibid.* Detective Johnson later clarified what he meant: The footage wasn't relevant, he explained, because "[t]here was no video to check hours prior to the crime scene being shown on the video." *Id.* at 636.

This *isn't* at all inconsistent with his deposition testimony. To the contrary, at both his deposition and the trial, Detective Johnson attested that neither camera had stored video footage from the time of the shooting. *See ibid.* ("[T]he video I did receive started without [sic] a crime scene person arriving at the scene. Meaning, this incident occurred hours before that crime scene person arrived, and the video was not available at that point."); *see also id.* at 723 ("[Defense Counsel:] [Detective Johnson] told me for two pages in [his] depo 'No video, no video, no video, no relevant video[.]'"). And there's no other evidence in the case about what kinds of footage these cameras retained. Since the only testimony on this issue establishes that the State never retrieved the videos from these cameras—and given that the footage on these cameras wasn't relevant to the case in any event—the State didn't violate the strictures of *Brady* by not disclosing those videos. *See Stinson v. Sec'y, Dep't of Corr.*, 2013 WL 360323, at *15 (M.D. Fla. Jan. 30, 2013) (Honeywell, J.) ("Petitioner has not pointed to any evidence that *Brady* material existed and was not turned over. As a result, Petitioner has no basis to contend that counsel's performance was deficient or that he was prejudiced by counsel's alleged failure to request *Brady* material." (citing *Armatullo v. Taylor*, 2005 WL 2386093, at *18 (S.D.N.Y. Sept.

28, 2005))). And, it goes without saying, Pierre's trial counsel cannot be faulted for failing to fight for videos that didn't exist.

Still resisting, Pierre has conjured up a conspiracy involving Detective Johnson, the state prosecutors, the records custodian, and the state court—all of whom (he now says) know that these exculpatory videos exist and are doing everything in their power to suppress them. *See* Reply at 2 ("Everything the Respondent said [about Ground One] is false, misleading and improper."); Reply to Respondent's Response to this Court's July 7, 2022 Order [ECF No. 52] at 5 ("[T]he State Courts should have granted the Writ of Mandamus for an evidentiary hearing and an in-camera inspection if the State Courts were not prejudiced."). But the state courts have *twice* concluded that the State never possessed any such videos. *See* Postconviction Response [ECF No. 9-1] at 178 ("Therefore, as the record clearly demonstrates, there was no exculpatory evidence on the video because the video only included events hours after the incident."); Mandamus Response [ECF No. 49-1] at 11 ("Accordingly, Ms. Williams ordered and personally searched the file, but could not locate any videos within the box containing the file or within the file itself.").[5] And, as we've explained, "a determination of a factual issue made by a State court shall be presumed to be correct" unless Pierre can overcome this presumption with "clear and convincing evidence[.]" 28 U.S.C. § 2254(e)(1). Pierre, of course, has *no* evidence—just his speculation about a conspiracy he's invented by conveniently ignoring most of what Detective Johnson *actually* said at trial. *Cf. Gordon v. Sec'y, Dep't of Corr.*, 2016 WL 1436600, at *9 n.11 (M.D. Fla. Apr. 12, 2016) (Steele, J.) ("Petitioner's speculation as to what the [missing dash-cam] video may have shown is not clear and convincing evidence of the sort to overcome the presumption of correctness afforded a state court's factual determinations.").

---

[5] In each of these instances, the state court simply adopted the arguments the State had advanced in its briefing. *See* Order Denying Postconviction Motion [ECF No. 9-1] at 193 ("The Court adopts the reasoning as set forth in the response of the State[.]"); Order Denying Petition for Writ of Mandamus [ECF No. 49-1] at 57 ("DENIED for the reasons set forth in the State's Response to the Petition for Writ of Mandamus.").

We'd also be remiss not to point out two *other* crucial flaws in Pierre's argument. *First*, Pierre ignores that his trial counsel deployed the *absence* of any video evidence as a crucial part of his defense strategy. During his closing argument, in fact, trial counsel argued that the jury should acquit Pierre *precisely* because the lack of any video footage suggested a shoddy investigation—so shoddy, counsel insisted, as to create a reasonable doubt:

> Is it reasonable to assume if the camera is working from 12:15 to 12:45 at night, and cameras don't fix themselves, why don't we have a video from 9:00 to 12:00? . . . Why is the camera there? For security, to prevent murder. And if a murder happens let's go get a photo of the murderer at the front gate. So, this is a lack of evidence, an important lack of evidence that there is no video. There is no video. How important would that have been? You don't have to rely on people at night identifying a person with a mask on during an emotional violent incident. No, you'd have video, a video of the person arriving. It would be huge.

Trial Tr. [ECF No. 10-1] at 724–25. Again, we presume that counsel's strategic decisions at trial are "reasonable" unless the petitioner can "establish that *no competent counsel* would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315 (emphasis added). Pierre cannot meet this heavy burden here. Trial counsel's frontal assault on a gap in the government's evidence is just the kind of strategic decision any seasoned lawyer would have made in these circumstances. *See, e.g.*, *Stepp v. Jones*, 2018 WL 9439863, at *7 (S.D. Fla. Aug. 29, 2018) (Altonaga, J.) ("Petitioner's counsel's decision not to subpoena Petitioner's phone records was a reasonable trial strategy predicated on the State's lack of evidence, and as such cannot support a collateral claim of ineffective assistance.").

*Second*, Pierre cannot prove that he was prejudiced by counsel's "failure" to assert a *Brady* challenge. That's because the video footage—if it did exist—would've only further established Pierre's guilt. Recall that *both* Pierre's ex-wife *and* his own son identified him, in unambiguous testimony, as the shooter. *See Pierre*, 246 So. 3d at 548 ("[T]he jury could have found Pierre guilty based on the eyewitness testimony of his son and ex-wife alone.").[6] Recall, too, that Pierre was found hours later in

---

[6] We discuss the testimony of Pierre's son and ex-wife in more detail below. *See infra* Section II.D.

a rental car that had sustained *precisely the same* damage the shooter's car had sustained during the attack. *See id.* at 547 ("As Pierre attempted to flee, the son threw a brick at the passenger side of Pierre's window, smashing the rearview mirror. Five hours later, Pierre was apprehended in a rental car with a missing rearview mirror."). There's thus no "reasonable probability" that any such camera footage would have altered the outcome of this case. Ground One, in short, is **DENIED**.

### B. Ground Two

In his second claim, Pierre contends that his trial lawyer "was ineffective for failing to object to the Court's forty nine day continuance after the jury was selected." Petition at 4. Pierre maintains that counsel should have "object[ed] when the jury returned so that the jury could again be voir dire to find out whether their answers to the original voir dire were the same and if not motion for a mistrial." *Ibid.* (errors in original); *see also* Postconviction Motion [ECF No. 9-1] at 158–59 ("Counsel's performance was further deficient for failing to object after the jury returned and to again voir dire the selected jury to find out if the individual juror's views of the questions they were asked in the original voir dire were the same." (errors in original)). The Respondent counters that "there was no basis for the defense counsel to object to the trial date, and no reason to believe the result would have been different even if he had," and adds that Pierre's theory about the jury's answers changing over the break was "based on speculation." Response at 17. We agree that the state court reasonably applied *Strickland* in denying this claim because "[t]here is no reasonable probability the results of the proceeding would have differed without this break in time from the jury being sworn in to the trial resuming." State's Postconviction Response [ECF No. 9-1] at 185.

The backdrop to this challenge is, admittedly, unusual. The state court opened Pierre's voir dire on July 18, 2016. *See* Trial Tr. [ECF No. 10-1] at 2–3. But, as the judge was questioning a member of the venire about a preplanned vacation, he made the following statement:

> Maybe just today, we may just pick a jury today, because we are not going to conclude the case tomorrow. Thereafter[,] I've got annual leave, and I don't want to leave you

> hanging in the middle of the case. Maybe we will just pick a jury today, and we agree
> upon a time in the future to come back, right, that makes a lot more sense.

*Id.* at 171. Later in the day, the judge informed the parties that "the trial is probably going to last at least two weeks on August 15. So the earliest, I believe, [we can] reschedule is as far as the 29th of August, September right. We can talk to the jurors about that." *Id.* at 207. The trial judge then decided that the trial should pick back up on September 6, 2016—the day after Labor Day. *See id.* at 210–11 ("I think we are looking as far as September 6th."). The court and the parties then proceeded to select a jury that would be available on September 6. *See id.* at 224. After the jurors were sworn—but before they were discharged—the court instructed them "not [to] communicate with anyone including friends and family members about this case," not to "discuss your thoughts about this case or ask for advice on how to decide this case," and not to "do any research . . . that may have anything to do with this case[.]" *Id.* at 226–27. Before excusing the newly sworn jurors, the trial judge reiterated:

> It's very important that you don't do any research with respect to any of the participants in this matter. Don't discuss it, don't have any conversations with the attorneys, the Defendant or any witnesses in the case, and we will see you on Tuesday[,] September 6th.

*Id.* at 230–31. The judge then repeated these same instructions to the jury when they returned on September 6, 2016. *See id.* at 243–53.

In rejecting the claim Pierre now reasserts in Ground Two, the state court adopted the two arguments the State advanced in its Postconviction Response. *See* Order Denying Postconviction Motion [ECF No. 9-1] at 193 ("The Court adopts the reasoning as set forth in the response of the State[.]"). *First*, noting that the trial court properly instructed the jury not to research or discuss the case—and that Florida law presumes "jurors will follow the jury instructions"—the State argued that Pierre wasn't "prejudiced by the break between the swearing in of the jury and the reconvening of the trial." State's Postconviction Response [ECF No. 9-1] at 183. *Second*, the State pointed out that, under Florida law, the trial judge may continue a trial "between the jury being sworn and the examination of

22

witnesses" *unless* the defendant can establish prejudice. *Id.* at 184. And, the State said, Pierre hadn't shown that he was prejudiced in any way. *See id.* at 185 ("There is no reasonable probability the results of the proceeding would have differed without this break in time from the jury being sworn in to the trial resuming.").

We cannot second-guess these findings—*viz.*, that Pierre failed to show (1) that the jury disregarded the court's instructions or (2) that he was prejudiced by the delay—unless Pierre can parry them with "clear and convincing" evidence. *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)). Again, however, Pierre offers no evidence—let alone "clear and convincing" evidence— as to either point. He merely speculates that, had his lawyer impelled the judge to re-question the jurors, *some* of the jurors' answers *might* have changed. *See* Postconviction Motion [ECF No. 9-1] at 159 ("It is *highly likely* that during that 49 day continuance that *some* if not all the jurors read newspaper articles or watched television news pertaining to the Defendant's case . . . . Plus the jurors were not sworn again after a month to see if they would still follow the law." (emphasis added)). This isn't "likely" at all. Florida law, on the contrary, "presumes that the jury followed the trial judge's instructions in the absence of evidence to the contrary." *Sutton v. State*, 718 So. 2d 215, 216 n.1 (Fla. 1st DCA 1998); *see also Love v. State*, 259 So. 3d 23, 52 (Fla. 2018) ("Moreover, in the absence of evidence to the contrary, we presume that jurors follow the trial court's instructions."). And, as we've shown, the record is clear that the trial judge *twice* instructed the jurors not to discuss the case with anyone, not to conduct any research about the case, and not to engage in any way with the facts of the case. *See* Trial Tr. [ECF No 10-1] at 226–27, 230–31; *cf. Hatton v. Sec'y, Fla. Dep't of Corr.*, 2021 WL 4281287, at *4 (11th Cir. Feb. 10, 2021) (rejecting an argument that the jury's "puzzled looks" indicated that they ignored the trial court's instructions). Again, Pierre's baseless speculation isn't enough for us to disregard the state court's factual findings. *See Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner[.]"). Pierre has

thus failed to show that his lawyer was ineffective for failing to object to the judge's decision *not* to re-question the jury. *See Freeman v. Att'y Gen.*, 536 F.3d 1225, 1233 ("A lawyer cannot be deficient for failing to raise a meritless claim[.]"). And, for similar reasons, he cannot show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[7]

Ground 2 is, therefore, **DENIED**.

**C. Ground Three**

Ground Three is the first of Pierre's two appellate-counsel claims. Here, Pierre says that his appellate lawyer was ineffective for "failing to argue on direct appeal that the lower court erred in overruling defense counsel's objection and motion for mistrial concerning the lower court improperly questioning Petitioner." Petition at 5. The claim arises from the following exchange during the State's cross-examination of Pierre at trial:

Q: How did the right passenger's window get broken and smashed?

A: I already told you what I'm going to tell you again.

Q: Did you hear my question?

A: I hear the question. I'm going to tell you.

---

[7] We also reject Pierre's separate contention that the delay itself was inherently prejudicial. *See* Postconviction Motion [ECF No. 9-1] at 160 ("The jury should have never been selected in the first place knowing that the case would be continued for [49] days before any argument or evidence would be presented in this case."). As both the Respondent and the trial court acknowledged, a continuance during trial "is left to the discretion of the [trial] court[.]" Response at 16 (quoting *McDermott v. State*, 383 So. 2d 712, 714 (Fla. 3d DCA 1980)); *see also* State's Postconviction Response [ECF No. 9-1] at 184 (citing *McDermott*). And the trial court's discretion will be disturbed *only* where the defendant can establish that the continuance prejudiced him. *See McDermott*, 383 So. 2d at 714 ("Generally, prejudice is not presumed but must be demonstrated by the party allegedly aggrieved."); *Compo v. State*, 525 So. 2d 505, 506–07 (Fla. 2d DCA 1988) ("Without a showing of prejudice, Compo's conviction must be affirmed."). We refuse to second-guess the state court's factual determination that the length of the continuance didn't prejudice Pierre. *Cf. McCullough*, 967 F.2d at 535 ("A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."). And, again, Pierre offers no evidence for his position that he was prejudiced.

Q: Specifically how did the right passenger's—

[Defense Counsel]: Objection, Judge, argumentative.

[Pierre]: Even the jury knows what I'm talking about. You'[re] trying to confuse me?

[Defense Counsel]: When there is an objection wait for the judge to rule.

The Court: Answer the question. Let the witness answer the question.

[Pierre]: Okay.

The Court: Answer the question.

[Pierre]: No, because I have to take it little bit if you are—

The Court: No, just answer the question. How did the passenger's window get broken?

Trial Tr. [ECF No. 10-1] at 662–63. Shortly after the trial court ordered Pierre to answer the prosecutor's question, the judge intervened again—this time because Pierre apparently tried to answer a question with a physical demonstration:

Q: Or was the rock thrown from the side of the car, if you can remember?

A: Okay. Let me explain.

Q: Do you understand my question?

The Court: Sir, we don't want you to demonstrate anything. Just have a seat.

[Pierre]: Let me explain to you.

The Court: We don't want you to explain. Which rock broke the window?

[Pierre]: Okay. The first one broke the window mirror. No, the first one broke the windshield.

The Court: The first rock broke the window.

[Pierre]: And the second one—I'm talking about the driver's side and part of the mirror.

[Defense Counsel]: Judge, can we approach one minute for an objection?

The Court: Let's move on. You can raise that matter—

[Pierre]: If they came back to the scene I would not even be here.

The Court: There is no question pending here.

[Pierre]: I know myself.

The Court: Mr. Pierre, there is no question pending. Mr. Newman, please.

*Id.* at 664–65.

After the testimony concluded, the judge gave defense counsel a chance to re-raise the objection he'd tried to make during the cross. *See id.* at 673 ("[The Court:] I want to give you [defense counsel] the opportunity to raise another matter."). At this, Pierre's lawyer moved for a mistrial, arguing that "the Court jumped in with some questions which, to the defense, sounded to us like [you] were not believing what the witness was saying, and you were directing cross-examination questions at him. I think the jury realized that the Court did not believe [Pierre's] testimony at that time[.]" *Ibid.* The trial court denied the mistrial motion, reasoning that "I had one question, it was only to reiterate questions that [were] asked by the State and not answered. . . . I certainly did not direct the State as to how they might cross-examine the Defendant, and I certainly didn't say anything, in my view, which explicitly indicated that the Defendant's testimony was unworthy of belief." *Ibid.*

In his state habeas petition, Pierre cited *Poe v. State*, 746 So. 2d 1211 (Fla. 5th DCA 1999), for his view that the trial court erred by "appear[ing] to take on the role of a prosecutor when questioning a witness during trial." State Habeas Petition Vol. I [ECF No. 9-1] at 294. In the Respondent's view, this was all much ado about very little. According to the Respondent, Pierre's appellate counsel was right not to raise this argument on appeal *both* because the issue hadn't been preserved *and* because the judge properly intervened "to maintain the integrity of the cross-examination[.]" Response at 21.

Pierre has failed to show that the Fourth DCA had no "reasonable basis" to deny Ground Three. *See Tarleton*, 5 F.4th at 1291. Trial judges have the inherent power to manage proceedings in their courtrooms—a power that allows judges (when necessary) to rebuke parties and their lawyers.

*See Liteky v. United States*, 510 U.S. 540, 556 (1994) ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune [from challenge]."). And, under Florida law, "it is permissible for a trial judge to ask questions deemed necessary to clear up uncertainties as to issues in cases that appear to require it[.]" *J.F. v. State*, 718 So. 2d 251, 252 (Fla. 4th DCA 1998).

That's exactly what happened here. The judge interacted with Pierre twice during cross-examination—both times to direct Pierre to answer the prosecutor's question. *See* Trial Tr. [ECF No. 10-1] at 663 ("The Court: No, just answer the question. How did the passenger's window get broken?"); *id.* at 665 ("The Court: We don't want you to explain. Which rock broke the window?"). These interventions were plainly appropriate—even in front of the jury. *See Ellis v. Henning*, 678 So. 2d 825, 827 (Fla. 4th DCA 1996) ("A trial judge's expression of dissatisfaction with counsel or a client's behavior alone does not give rise to a reasonable belief that the trial judge is biased and the client cannot receive a fair trial." (citing *Oates v. State*, 619 So. 2d 23, 25–26 (Fla. 4th DCA 1993))). The judge never "crossed the line from neutral arbiter to advocate" because he was simply directing Pierre to answer—in words and not with a physical demonstration—the lawyer's questions. *Sparks v. State*, 740 So. 2d 33, 36 (Fla. 1st DCA 1999); *cf. id.* at 37 ("In this case, the trial court judge crossed the line . . . by directing the prosecutor's attention to evidence on the core issue of the credibility of the defendant."); *Simmons v. State*, 803 So. 2d 787, 788–89 (Fla. 1st DCA 2001) ("The trial court overruled defense counsel's mischaracterization of evidence objection by saying, '[i]t is accurate and dead on point.' . . . The comment made by the judge in this case appears to validate the State's argument, and therefore, it was error." (alteration in original)); *Chastine v. Broome*, 629 So. 2d 293, 294 (Fla. 4th DCA 1993) (holding that a trial judge behaved improperly when she "wrote a note that she 'passed' to the prosecutor which read 'sometimes it is better not to cross-examine witnesses'"). Since the Fourth DCA had a "reasonable basis" to find the trial court's behavior appropriate, appellate counsel cannot

be blamed for having failed to raise this issue on direct appeal. *See United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) ("Appellate counsel is not ineffective for failing to raise claims reasonably considered to be without merit." (cleaned up)). We therefore **DENY** Ground Three.[8]

### D. Ground Four

Ground Four is Pierre's second appellate-counsel claim. Here, Pierre contends that appellate counsel should have "argued on direct appeal that the prosecutor's improper arguments and misconduct rose to the level of fundamental error." Petition at 6. Under Florida law, an error is fundamental when it "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Pinkney*, 876 F.3d at 1297 (quoting *Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996)). Unfortunately for Pierre, his Petition does not "identify what comments in specific [sic] should have been raised on appeal. For this reason, Petitioner fails to demonstrate error or prejudice." Response at 23; *see also Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him. . . . '[J]udges are not like pigs, hunting for truffles buried in briefs.'" (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th

---

[8]    In his Reply, Pierre claims that the Respondent "left out the most important portion of the argument where the trial judge told Mr. Sylvia to say that the vehicle the Petitioner was driving was a Toyota Corolla instead of a Toyota Camry." Reply at 7. Of course, it was Pierre himself who caused this "mistake" since, in Ground Three, he only complains about "the lower court improperly questioning *Petitioner*"—not Mr. Sylvia. Petition at 5 (emphasis added). And we won't consider a new argument a party has raised for the first time only in reply. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not fully presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").
    Waiver aside, Pierre's argument is meritless. In the comment Pierre is now challenging—"[The Court:] You need to say it was the Corolla"—the trial judge was unmistakably talking to the prosecutor, *not* to Mr. Sylvia. *See Trial Tr.* [ECF No. 10-1] at 619. In doing so, the judge was simply clarifying that the prosecutor was referring to a Toyota Corolla instead of a Toyota Camry. *See ibid.* ("The Court: I think you misspoke. You said it was the Toyota— Mr. Newman: Right. The Court: You need to say it was the Corolla. Mr. Newman: Correct."). He was, therefore, simply clarifying an inadvertent misstatement by the lawyer—and there's nothing wrong with that. *See J.F.*, 718 So. 2d at 252 ("[I]t is permissible for a trial judge to ask questions deemed necessary to clear up uncertainties as to issues in cases that appear to require it[.]").

Cir. 1991))). Without any specific allegations about what the prosecutor did wrong, we cannot say that the Fourth DCA lacked a "reasonable basis" to deny this claim. *Tarleton*, 5 F.4th at 1291.

We note, however, that it would have been reasonable for the Fourth DCA to conclude that *nothing* the prosecutor said during closing argument would've amounted to "fundamental" error under Florida law. That's because the Fourth DCA already found that there was overwhelming evidence of Pierre's guilt, "as the jury could have found Pierre guilty *based on the eyewitness testimony of his son and ex-wife alone.*" *Pierre*, 246 So. 3d at 548 (emphasis added); *see also Kilgore*, 831 So. 2d at 898 (reiterating that an error is only "fundamental" when "a verdict of guilty *could not have been obtained* without the assistance of the alleged error." (emphasis added)). Pierre never challenges this critical (and dispositive) aspect of the Fourth DCA's decision, *see generally* Petition; Reply—which is a second independent reason to deny this claim.

We now add a third reason: Having reviewed the transcript, we agree with the Fourth DCA that the testimony of these two witnesses was, standing alone, sufficient to secure a conviction. *See, e.g.*, Trial Tr. [ECF No. 10-1] at 288 ("[Marie Pierre]: Yes. He was angry about the child support. . . . He told me (speaking in Creole). Q: What does that mean in English? A: That means in English who will live, we'll see. Q: Did you take that as a threat to injure or kill you? A: Yes. It's a threat."); *id.* at 295 ("Q: Did you know that it was Joseph Pierre immediately? [Marie Pierre]: Yes. I called his name. I saw him by my side and I said Joseph is shooting me. . . . I did know it was him because we've been together for the past thirty years[.]"); *id.* at 471–72 ("Q: When did you identify him in your mind? How soon after that? . . . [Pierre's Son]: He seen me running after him. He turned around and I seen the ski mask, but I could still see his face. Like he had a ski mask, but somehow it got loose and I could see just up and I seen him.").[9] Ground Four is **DENIED**.

---

[9] Naturally, this "error" would also be harmless under *Brecht*. An error can't "substantially influence the jury's verdict" when there's other overwhelming evidence to support that verdict. *Brecht*, 507 U.S. at 639 (cleaned up).

### E.  Grounds Five and Six

In Ground Five, Pierre says that his trial counsel was ineffective for failing to argue that "the probative value of the admission of a multi colored ski mask was outweighed by the danger of unfair prejudice[.]" Petition at 7. In Ground Six, he claims that trial counsel should have "renew[ed] his objection to the [trial court] permitting [Mr. Sylvia] to testify outside his area of expertise[.]" *Id.* at 8. The state postconviction court adopted the State's Postconviction Response, *see* Order Denying Postconviction Motion [ECF No. 9-1] at 193, which had treated these two claims together, reasoning that "these issues were both addressed by the [Fourth DCA] in a written opinion"—albeit in the context of reviewing the trial court's ruling under a fundamental-error standard of review. State's Postconviction Response [ECF No. 9-1] at 186; *see also Pierre*, 246 So. 3d at 546 ("[Pierre] argues that the trial court erred in admitting a multi-colored ski mask that was not used in the crime and by permitting an expert witness to testify to an area outside of his expertise. As a result of waiver, we find no reversible error."). Relying on state law, the state postconviction court determined that the Fourth DCA's opinion precluded Pierre from showing that counsel's errors prejudiced him under *Strickland*. *See* State's Postconviction Response [ECF No. 9-1] at 188–89 ("Likewise, the record conclusively refutes the defendant's claim of prejudice as there was no reasonable probability based on the evidence at trial, including the testimony of the victim and the victim's son, the results of the trial would have differed but for counsel's alleged deficiency."). The Respondent adopts the state postconviction court's reasoning and urges us to do the same. *See* Response at 25 ("Because the alleged errors did not amount to fundamental error, they cannot result in *Strickland* prejudice and Petitioner's claims must fail.").

And we agree that Florida law forecloses Pierre's claims in Grounds Five and Six. Florida law is clear that a habeas petitioner cannot show *Strickland* prejudice once his fundamental-error claim (raised on direct appeal) has been rejected. *See Chandler v. State*, 848 So. 2d 1031, 1046 (Fla. 2003) ("Because Chandler could not show the comments were fundamental error on direct appeal, he likewise cannot show that trial counsel's failure to object to the comments resulted in prejudice sufficient to undermine the outcome of the case under the prejudice prong of the *Strickland* test."). And we're not the first to interpret Florida law this way. As the Eleventh Circuit has explained, "[if] the Florida court has already determined . . . that the error was not fundamental error, [a federal court] must defer to the 'Florida court's underlying determination of state law'" and find that the habeas petitioner "cannot show ineffective assistance under *Strickland*." *Pinkney*, 876 F.3d at 1297–98.

In his Reply, Pierre challenges the Fourth DCA's fundamental-error finding. *See* Reply at 9. Again, however, we won't consider arguments Pierre makes only in reply. *In re Egidi*, 571 F.3d at 1163. In any event, we cannot second-guess the Fourth DCA's fundamental-error determination because that's a question of state law. *See Pinkney*, 876 F.3d at 1299 ("[T]he fundamental error question is an issue of state law, and state law is what the state courts say it is. As the Supreme Court and this Court have repeatedly acknowledged, it is not the federal court's role to examine the propriety of a state court's determination of state law." (cleaned up)). Grounds Five and Six are therefore **DENIED**.

### EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). We resolved all of Pierre's claims on the merits under § 2254(d). And, since we have the benefit of a full trial record, we don't think we'd benefit from any further factual development. *See Williams*, 529 U.S. at 444 ("The Court of Appeals rejected this claim on the merits under § 2254(d)(1),

so it is unnecessary to reach the question whether § 2254(e)(2) would permit [or restrict] a hearing on the claim.").

<strong>CERTIFICATE OF APPEALABILITY</strong>

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)). We don't think reasonable jurists would find our resolution of Pierre's constitutional claims debatable or wrong. We thus **DENY** any request for a COA.

***

Having carefully reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Petition is **DENIED**, that a COA is **DENIED**, that any request for an evidentiary hearing is **DENIED**, that all deadlines are **TERMINATED**, and that any pending motions are **DENIED** as moot. The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 18th day of August 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     Joseph Pierre, *pro se*
        counsel of record